DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

COLIN C. SAMPSON (CABN 249784)
BENJAMIN KINGSLEY (CABN 314192)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    (415) 436-7200
    colin.sampson@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> AHMAD ABOUAMMO, <br><br> Defendant. | CASE NO. 3:19-71824 MAG <br> CASE NO. 3:19-CR-0621-EMC <br><br> UNITED STATES' REPLY IN SUPPORT OF MOTION FOR REVOCATION OF MAGISTRATE JUDGE ORDER OF RELEASE ON BOND CONDITIONS |

## INTRODUCTION

"Proactive and reactively we will delete evil my brother." *See* <u>Exhibit 6</u>. Those are the words defendant told his handler, a Saudi Arabian official who paid him hundreds of thousands of dollars—some of it to a bank account overseas—to betray his employer and its users by unmasking the real people behind Twitter accounts that circulated critical information about the Saudi Royal Family. Defendant characterizes the government's detention arguments—for a man charged with acting as an illegal agent of a foreign government that has the power, means, and incentive to facilitate his flight from this jurisdiction—as "preposterous" and "incredibl[e]," and contends that the government relies on "pure speculation."  Contrary to these arguments, the risk of flight by defendant is real and was

completely unaddressed by the bail conditions in this case that ordered him released without any sureties or bond.

Since the prior appearance in this case, a grand jury returned an indictment against defendant (CR-19-0621-EMC) and two others this morning. As the case has now been indicted in this district and assigned to District Judge Chen, and defendant is present here, the appeal of the initial order on the Rule 5 proceeding in Seattle is potentially moot. As this Court has familiarity with the case, it could rule with finality on the appeal. Alternatively, defendant's bond conditions could now be addressed through normal detention proceedings in this district, as they would have at defendant's initial appearance in this district had he been ordered detained by the magistrate court in Seattle. But in either event, defendant should be detained.

## PROCEDURAL BACKGROUND

On Tuesday, November 5, 2019, defendant was arrested at his home in Seattle on a criminal complaint signed by the Honorable Thomas S. Hixson, charging him with violation of 18 U.S.C. § 951 and 18 U.S.C. § 1519. As this Court is aware, a criminal complaint is a routine manner for initiating criminal proceedings against a defendant.

On Wednesday, November 6, 2019, defendant made his initial appearance in Seattle before a magistrate court of the Western District of Washington. The government moved for his detention, and a detention hearing was set in Seattle for Friday, November 8, 2019. On that date, the magistrate court in the Western District of Washington ordered defendant released, by that afternoon, with standard conditions (including basic travel restrictions) as well as location monitoring, but no sureties, custodians, curfew, or appearance bond.

Because that order failed to provide any meaningful set of conditions that would reasonably guarantee that defendant would remain in the United States and appear as ordered for proceedings here, the government filed an emergency appeal of that order to this Court as this district's duty district court, pursuant to 18 U.S.C. § 3145 and Crim. Local R. 5-1(d). Dkt. 6. Following this filing, that same day, this Court ordered that defendant remain in USMS custody pending a hearing on his detention, which was set for Tuesday, November 12. Dkt. 7. As defendant had not been ordered transported to San

Francisco from Seattle in custody, and as § 3145 does not specify the nature of the appeal proceedings beyond that they should be resolved "promptly," defendant was not immediately transferred 1,000 miles by the USMS over a three-day weekend for the hearing in this case on the next court business day, November 12.

On November 12, 2019, this Court held a hearing on defendant's bail status without his presence, and asked Pretrial Services to look into the availability of a halfway house for defendant. Dkt. 10. Following the hearing, the Court ordered defendant's response to the government's appeal motion to be filed by November 15 at noon, and scheduled a hearing for November 19 at 2 p.m. Dkt. 8. On the morning of November 18, defendant filed an opposition to the government's motion. Dkt. 11.

On November 19, 2019, a grand jury returned an indictment against defendant for the two charges alleged against him in the complaint. Now that defendant is in the district and the case has been indicted and has been assigned to Judge Chen to preside over the case on the merits, this case could proceed as it normally would had defendant been detained in Seattle—with an arraignment and initial appearance before a magistrate of this district.

**ARGUMENT**

At its core, the Bail Reform Act looks to whether there are conditions or combinations of conditions that can reasonably assure the presence of defendant at proceedings in this case. Defendant was released with a limited set of conditions—to his home, with GPS monitoring but no sureties, custodians, curfew, or secured bond. Those conditions do not assure that defendant, a dual citizen with an unreported foreign bank account and relatives overseas, who is charged with being an illegal foreign agent for a foreign government of effectively limitless resources—a government with a history in the underlying facts of this case of facilitating and rewarding the flight of someone who engaged in similar conduct—will be present for all proceedings in this case.

Defendant's opposition makes two primary argument. First, defendant contends that the nature of the charges in this case do not legally warrant a presumption of detention and that the complaint only identifies two instances in which defendant accessed user information. Dkt. 11 at 5–6. This contention misunderstands the nature of the government's argument. The nature of the charges and underlying

facts established in a detailed and sworn affidavit establish an elaborate scheme by a foreign government, executed mere blocks from the federal building, in which defendant's loyalty to his employer and to the United States of America was sold for a watch and several hundred thousand dollars. These funds included $200,000 paid in the span of five months by the foreign official into an account defendant created in his father's name, in order to hide the source and ownership of those criminal proceeds. The nature of the charges reveals that defendant will do illegal and dishonest things for money; that he has access to and knowledge of how to receive and hide assets overseas; and that he has acted as an asset of a wealthy and powerful foreign government which, now that he has charged, has every reason to reward defendant and get him out of the United States.

Second, defendant argues that his prior failure to flee—and communications between his defense attorneys and the government—following the government's interview of him and search of his house in 2018 prove that he wishes to face charges here instead of flee. Dkt. 11 at 6–8.

As an initial matter, defendant's opposition inaccurately implies that he traveled to Lebanon following the search in this case. *See* Dkt. 11 at 7 ("He traveled several times, including to Lebanon on 2018 and Boston approximately a month ago, and did as any other person would do: he returned home to Washington."). In so arguing, defendant fails to acknowledge that this travel occurred two months *before* the FBI made contact with him. His travel at a time when he likely was unaware that he was under investigation in no way undercuts the government's argument about his risk of flight.

In any event, the significance of defendant's failure to flee following his initial contact with the FBI is undercut by the deception that he paired with his decision to remain in place. Defendant did not honestly confront his situation at the time of interview and search. Instead, defendant is charged with generating and sending to the FBI a false invoice to conceal the nature and extent of his work for a foreign official. In his interview, he acknowledged that he had received a watch from the foreign official, but falsely described it to the FBI as "plasticky" and "junky," while knowing he had previously tried to sell it for $20,000, and that it was in his house, though the searching agents could not locate it four days later. *See* Exhibit 7.

Defendant was hedging his bets. Unlike Ali Alzabarah, defendant did not flee immediately, and instead lied to the government and hired attorneys in the hope that he could avoid being prosecuted for the very serious crimes he is now alleged to have committed. But he has now been indicted, and the potential of significant jail time has now, for the first time, become more than a hypothetical. Rather than face these charges, he can attempt to flee to a foreign country that has already rewarded him (and his co-defendant) handsomely for deceitful conduct. That his attorneys told the FBI where he lived in Seattle when he had not been charged—and where the FBI could easily find him—says nothing about his plans now that he has been charged. Defendant would not be the first defendant in this district whose flight followed months, pre- or post-charges, of remaining in place.

Although his family resides in Seattle, his ties to the community are relatively limited, as he only moved there relatively recently and is not employed. The admission that the defendant is "suffering serious mental health issues, not working, collecting food stamps, piled up debt," Dkt. 11 at 9, underscores the concern that he will seek to flee to Lebanon, where he is a citizen and has a parent, Egypt, where he has another parent, or Saudi Arabia, which assisted his codefendant in fleeing the United States. *See* 18 U.S.C. § 3142(g)(3) (factors to consider include "the person's character, physical and mental condition, family ties, employment," among other factors). Without reported assets in the United States or serious job prospects (having been charged with betraying one prior employer for a foreign sovereign), his reasons to flee have only increased in the time since the FBI first contacted defendant. And though he has declared bankruptcy, he has undisclosed foreign accounts that may have, or through which he may continue to receive, funds.

Without meaningful conditions and with no assets in the United States to post for bond, and with a patron government able to manufacture his escape, the assurance that defendant would appear for proceedings in this case would be based almost entirely on his promise to this Court not to flee. Even beyond the facts discussed above, there is a separate, independent basis to doubt his honesty on any such promise to this Court—Abouammo appears to have made false statements to a federal court in his 2019 bankruptcy proceeding. Specifically, defendant's Chapter 7 Bankruptcy application, signed under penalty of perjury, appears to contain numerous instances of false information. *See* Exhibit 3, Dkt. 6-1,

p. 43 (*In re Abouammo*, 19-13162-TWD (Bankr. W. D. WA), ECF No. 1) (redacted)).  He did not report the bank account in Lebanon (referenced in the complaint and into which he received funds from the foreign official) and denied closing or transferring any bank accounts in the previous year.  *Id.* at 69.  In reality, based on information provided to the government in response to an MLAT request, the account in Lebanon was open as of the end of 2018 and may still be open.  Also in his application, Abouammo stated that he had "not used any business name or EINs" in the past eight years, *id.* at 33, but Abouammo had created and used CYRCL, LLC in 2015 and 2016, and he had spoken to the FBI about his operation of CYRCL, LLC when he was interview in October 2018.  Abouammo also stated in several places that he lives in the residence that he appears to have vacated nearly a year earlier and rents out, possibly to avail himself of a homestead exemption.  *Ibid.*; *see also id.* at 47 ($125,000 exemption claimed), 60 ($1,250/month average AirBnB income).  Under these facts, any promise defendant makes to this Court to appear is of no value.

## CONCLUSION

Based upon defendant's lack of sufficient community ties or employment, dishonesty in speaking with government agents and in sworn filings, and the nature of the allegations contained in the complaint and the indictment, the government respectfully asserts that it has met its burden and established that there are no known conditions that will reasonably assure defendant's appearance in this case.

Date: November 19, 2019.                Respectfully submitted,

                                                                 DAVID L. ANDERSON
                                                                 United States Attorney

                                                                 */s/ Colin Sampson*
                                                                 COLIN SAMPSON
                                                                 BENJAMIN KINGSLEY
                                                                Assistant United States Attorneys